# Constitutionality of the Proposed Revision of the International Traffic in Arms Regulations

Proposed revision of the "technical data" provision of the International Traffic in Arms Regulations (ITAR) redefines and narrows the class of transactions that are subject to a licensing requirement under the Arms Export Control Act of 1976, in an attempt to avoid imposing a prior restraint on speech protected by the First Amendment; however, even as revised the ITAR can have a number of constitutionally impermissible applications.

The licensing requirement in the ITAR may constitutionally be applied to transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology; it may also be applied to transactions involving the dissemination of technical data for the purpose of promoting the sale of technical data or items on the Munitions List, since the prior restraint doctrine has only limited applicability to "commercial speech." However, insofar as it could be applied to persons who have no connection with any foreign enterprise, who disseminate technical data in circumstances in which there is no more than a belief or a reasonable basis for believing that the data might be taken abroad by foreign nationals and used there in the manufacture of arms, the licensing requirement is presumptively unconstitutional as a prior restraint on speech protected by the First Amendment.

It is not certain whether a court would find that the revised ITAR are so substantially overbroad as to be void and unenforceable in all their applications, or decide to save the regulations through a narrowing construction. The best legal solution is for the Department of State, not the courts, to narrow the ITAR so as to make it less likely that they will apply to protected speech in constitutionally impermissible circumstances.

July 1, 1981

## MEMORANDUM OPINION FOR THE OFFICE OF MUNITIONS CONTROL, DEPARTMENT OF STATE

The views of this Office have been requested concerning the constitutionality of a proposed revision of the "technical data" provisions of the International Traffic in Arms Regulations (ITAR). 45 Fed. Reg. 83,970 (December 19, 1980). On the basis of the analysis set forth below, we conclude that from a constitutional standpoint, the revised ITAR is a significant improvement over the prior version, but that even as revised, it can have a number of unconstitutional applications. We recommend that the proposed revision be modified to minimize or eliminate the number of impermissible applications. Our views are set forth in more detail below.

202

# I. Background

The ITAR are promulgated pursuant to the Arms Export Control Act of 1976 (the Act). 22 U.S.C. § 2778. The Act authorizes the President "to control the import and export of defense articles and defense services and to provide foreign policy guidance to persons of the United States involved in the export and import of such articles and services" and to "designate those items which shall be considered as defense articles and defense services . . . and to promulgate regulations for the import and export of such articles and services." § 2778(a). Items so designated are placed on the United States Munitions List. Every person engaging in the business of "manufacturing, exporting, or importing" designated defense articles or services must register with the Office of Munitions Control. § 2778(b). No such articles or services may be exported or imported without a license issued in accordance with regulations promulgated under the Act. § 2778(b)(2). Violation of the statute or the regulations promulgated thereunder is a criminal offense. Pursuant to its authority to regulate the export of "defense articles and services," the Office of Munitions Control has traditionally undertaken to regulate the export of technical *information* relating to the manufacture or use of items on the Munitions List. The "technical data" provisions are the embodiment of that undertaking.

The proposed revision defines technical data to include unclassified information not in the public domain and relating directly to, *inter alia,* the performance of defense services; training in the operation or use of a defense article; and design, production, or manufacture of such an article.[1] In general, the relevant provisions require the issuance of a license for the export of any unclassified technical data. A license is not, however, required for the export of unclassified technical data included within certain specified categories of exemption. Among those categories are exports of data published or generally available to the public,[2] exports in furtherance of a manufacturing license agreed to by.

---

[1] Under § 121 315, "technical data" means
    (a) Unclassified information not in the public domain relating directly to:
        (1) The design, production, manufacture, processing, engineering, development, operation, or reconstruction of an article; or
        (2) Training in the operation, use, overhaul, repair or maintenance of an article; or
        (3) The performance of a defense service (see § 121.32);
    (b) Classified information relating to defense articles or defense services, and
    (c) Information covered by a patent secrecy order
45 Fed. Reg. 83,976 (1980)
[2] The ITAR exempts technical data if they "are published or otherwise generally available to the public".
    (i) Through sales at newsstands and bookstores;
    (ii) Through subscription, unrestricted purchase, or without cost;
    (iii) Through second class mailing privileges granted by the U S. Government; or,
    (iv) Are freely available at public libraries.
45 Fed. Reg. 83,985 (1980)

the State Department, and exports related to firearms not in excess of caliber .50. Most importantly for present purposes, the revised provisions exempt technical data which:

> consists of information which is not designed or intended to be used, or which could not reasonably be expected to be used, in direct application in the design, production, manufacture, repair . . . of defense articles (for example, general mathematical, engineering, or statistical information not purporting to have or not reasonably expected to be given direct application to defense articles.) An advisory opinion may be sought in case of doubt as to whether technical data is exempt under this category.

45 Fed. Reg. 83,985 (1980).

With reference to technical data, the proposed revision defines the term "export" to include both the sending, transmitting, or removal of technical data from the United States, and the transfer of such data to a foreign national when the transferor knows or has reason to know that the transferred data will be sent, transmitted, or taken out of the United States. Disclosure to a foreign national of technical data relating to "significant military equipment," whether in the United States or abroad, is also an "export." Finally, the proposed revision expressly provides that an "export" occurs when (1) technical data are disclosed to a foreign national abroad or (2) technical data are disclosed to a foreign national in the United States when the transferor knows or has reason to know that the disclosed technical data will be disclosed outside the United States.

## II. Discussion

The constitutionality of the ITAR was considered and questioned in a memorandum prepared by this Office in 1978 at the request of Dr. Frank Press, Science Advisor to the President. *See* Memorandum of May 11, 1978, for Dr. Frank Press, Science Advisor to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel entitled "Constitutionality Under the First Amendment of ITAR Restrictions on Public Cryptography." On their face, the previous regulations appeared to establish a general administrative rule that required persons subject to United States jurisdiction to apply to the Department of State for a license before communicating technical data to foreign nationals. The regulations were drafted in such a way that this rule could have been applied not only to persons who undertook to transmit technical data during the sale of arms or technical services abroad, but also to virtually any person involved in a presentation or discussion, here or abroad, in which technical data could reach a foreign national. In all such circumstances, anyone who proposed to

204

discuss or transmit technical data was, under the ITAR, an "exporter"; and he was therefore required by the ITAR to apply in advance for an administrative license, unless the technical data in question fell within the limited exemptions from regulation.

In the memorandum to Dr. Press, this Office concluded that the ITAR cast such a broad regulatory net that it subjected a substantial range of constitutionally protected speech to the control of the Department of State. Because this control was exercised through a system of administrative licensing—a system of "prior restraint"—we concluded that the relevant regulations were presumptively unconstitutional. We also concluded, however, with particular reference to cryptographic information, that the constitutional difficulties presented by this system of prior restraint might be overcome without limiting the range of transactions to which the ITR purported to apply. The difficulties might be overcome if: (1) the standards governing the issuance or denial of an administrative license were defined more precisely to guard against arbitrary and inconsistent administrative action; and (2) a procedural mechanism was established to impose on the government the burden of obtaining prompt judicial review of any State Department decision barring the communication of cryptographic information.

The present proposal for revision of the ITAR does not attempt to satisfy the second condition described in the previous memorandum. It does, however, redefine the class of transactions that are subject to the licensing requirement. It is therefore necessary to determine whether the redefinition of coverage is sufficiently responsive to the constitutional objections raised by our previous opinion concerning the issue of prior restraint to require a different conclusion. If the redefinition of coverage ensures that the licensing requirement can no longer apply to speech that is constitutionally protected against prior restraint, the concerns expressed in our previous opinion will no longer be relevant to the constitutional analysis. On the other hand, if the redefinition does not significantly contract the coverage, the prior restraint doctrine must be taken into account. We adhere to the positions regarding constitutional limits in this area articulated in the memorandum to Dr. Press. If the revised technical data provisions are drafted so broadly that they impinge on speech that is protected against prior restraint, they are presumptively unconstitutional in their application to the speech. Moreover, if their overbreadth is substantial, they may be void and unenforceable in all their applications, although we cannot fully assess that possibility without examining the constitutional status of the entire range of transactions to which they may apply.

The revised technical data provisions may apply to three general categories of transactions: (1) transactions involving the direct transmission of technical data by an exporter to a foreign enterprise under a contract or other arrangement entered into by the exporter for the

205

purpose of assisting the foreign enterprise in the acquisition of use of technology; (2) transactions involving the dissemination of technical data for the purpose of promoting or proposing the sale of technical data of items on the Munitions List; and (3) transactions in which an "exporter" who is not otherwise connected or concerned with any foreign enterprise transmits technical data knowing, or having reason to know, that the data may be taken abroad and used by someone there in the manufacture or use of arms.

We have concluded that the application of the revised technical data provisions to transactions in the first two categories described above will not violate the First Amendment prohibition against prior restraint. However, the application of these provisions to transactions in the third category will raise serious constitutional questions. Our ultimate conclusions about the constitutionality of the technical data provisions are set forth, together with our recommendations for revision, in section III below.

(1) *Transactions involving arrangements entered into by exporters to assist foreign enterprises in the acquisition or use of technology.* At its core, the ITAR is designed to control United States firms and individuals who undertake to assist foreign enterprises in the acquisition and use of arms. The purpose of the technical data provisions is to extend that control to transactions in which assistance takes the form of technical advice. Perhaps the most common example of a transaction of that kind is a straightforward commercial arrangement in which an American firm agrees to provide technical information or advice to a foreign firm engaged in the manufacture of an item or items on the Munitions List.[3]

The leading case involving the constitutionality of the ITAR arose in precisely that context. *See United States* v. *Edler Industries, Inc.,* 579 F.2d 516 (9th Cir. 1978). In *Edler,* an American firm specializing in aerospace technology, Edler Industries, agreed to provide a French firm with technical assistance and data relating to a tape wrapping program. The Office of Munitions Control denied Edler's application for export licenses on the ground that exportation of the information in question would violate United States policy as established by the Act. During the pendency of the license applications, and after the denial, Edler proceeded to perform the contract and transmitted the information to the French firm. Edler was then prosecuted under the Act. Edler defended on the ground, among others, that the transmission of technical information under the contract with the French firm was constitutionally protected "speech" and that the government could not require such "speech" to be licensed in advance. The trial court rejected that contention and Edler was convicted.

---

[3] We can imagine more exotic examples that would proceed upon essentially the same legal footing, *e.g.,* a transaction in which an American agent (an "industrial spy") transmits sensitive technical information to his foreign principal.

On appeal, the Ninth Circuit upheld Edler's defense in part. The court concluded that the definition of "technical data" then appearing in 22 CFR § 125.01 (1977) should be interpreted narrowly in light of the applicable constitutional limitations, § 1934 of the Act,[4] and the relevant legislative history. Under the Act, the regulations should be construed to bar "only the exportation of technical data significantly and directly related to specific articles on the Munitions List." *Id.* at 521. Moreover, if the information in question "could have both peaceful and military applications," the regulations should be construed to apply only in cases in which the defendant knew or had reason to know that the information was "intended for the prohibited use." *Id.* That construction was necessary "to avoid serious interference with the interchange of scientific and technological information." *Id.* If the regulations and the statute were construed to apply only in the case of knowledge or reason to know of an intended prohibited use, they would not "interfere with constitutionally protected speech." *Id.* They would merely control "the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise," and for that reason they would not impose an unconstitutional prior restraint on speech. *Id.* Finally, although the district court had correctly rejected certain elements of the defendant's First Amendment defense, it had adopted an impermissibly broad construction of the regulations, and therefore the case was ordered retried in accordance with the narrower construction.

On the facts presented, the essential holding of *Edler*—that the previous ITAR could be applied constitutionally to an exporter who had agreed to assist a foreign firm in the development of a new technology, having reason to know that the foreign firm intended to use the technology to manufacture items on the Munitions List—was consistent with the traditional principles the courts have applied in the interpretation of the First Amendment. Indeed, the novelty of *Edler* lay not in that holding, but in the defendant's claim that the transmission of technical information under the agreement with the French firm was constitutionally protected "speech." The courts have consistently held that whenever speech is an "integral part" of a larger transaction involving conduct that the government is otherwise empowered to prohibit or regulate, the First Amendment does not immunize that speech; nor does it bar prior restraint. *See, e.g., Ohralik* v. *Ohio State Bar Assn.,* 436 U.S. 447, 456 (1978), and cases cited therein; *Giboney* v. *Empire Storage & Ice Co.,* 336 U.S. 490 (1949). That principle comes into play in a number of contexts: most importantly, where speech is joined with conduct by an agreement or special relationship between

---

[4] This provision was repealed in 1976 and replaced by the current provision, 22 U S.C. § 2778. For purposes of the interpretation adopted by the *Edler* court, however, the changes in § 1934 are not material.

the speaker and the actor. For example, under the law of conspiracy, when one individual enters into an agreement with another to rob a bank or to restrain trade and provides the other with the information which facilitates that action, neither the agreement nor the transmission of the information is constitutionally protected. *See id.*

To be sure, there is a doctrinal difficulty in applying this traditional analysis to international transactions of the kind involved in *Edler*. When the defendant in *Edler* agreed to assist the French firm in the development and use of sensitive technology, it was not undertaking to aid that firm in conduct that was itself illicit or unauthorized as a matter of domestic law. Our nation has a compelling interest in suppressing the development and use of sensitive technologies abroad, but it has no general power to "outlaw" the development of technology by foreign enterprises or to require them to apply here for a license before making or using arms. As a matter of domestic law, the government's only recourse is to control persons subject to United States jurisdiction who would undertake to aid and abet those foreign endeavors.

We believe that the absence of a direct domestic prohibition against the foreign conduct in question here—the foreign manufacture or use of items on the Munitions List—does not create a constitutional barrier to domestic regulation of persons who combine with foreign enterprises to assist them in the development and use of sensitive technology. Even though such assistance may take the form of technical advice, it is, in the *Edler* context, an integral part of conduct that the government has a compelling interest in suppressing by appropriate means. As the *Edler* court held, such assistance is not constitutionally protected speech; and it is not protected by the constitutional prohibition against prior restraint.

We have one further observation concerning the *Edler* case. *Edler* held that the licensing requirement of the previous ITAR could be enforced where: (1) the foreign recipient of technical data intended to use it in the manufacture or use of items on the Munitions List; and (2) the exporter had "reason to know" of that intention. Given the nature of the transaction that was involved in *Edler,* those requirements imposed what the Ninth Circuit considered to be necessary limitations on the power of the government to license the transmission of sensitive technical information under international contracts and combinations.[5]

---

[5]There is room to doubt whether the concise and somewhat ambiguous language adopted by the *Edler* court in the statement of the applicable rule, *see* 579 F.2d at 521, completely captures the relevant constitutional standard. The *Edler* rule presupposes that the foreign enterprise intends to use technical data in the manufacture or use of arms, and it suggests that the licensing requirement can be enforced only where the exporter has reason to know of that intention. But a respectable argument can be made that the constitutional power of the government to license persons who combine with foreign enterprises to assist directly in the development of sensitive technology abroad is not limited to cases in which the foreign enterprise has a present intention of using that technology in the manufacture of arms. The present intention of the foreign actor is constitutionally relevant, of course, but the actual source of the danger is the technical capacity that his action creates. That capacity is created on

Continued

They should be read in that context. We believe they cannot be read as implicitly authorizing the imposition of a general licensing requirement in every circumstance in which a speaker may have known or had reason to know that his speech could be used for a dangerous purpose by someone abroad. Beyond the *Edler* context—a context in which "speech" is joined with dangerous conduct by an actual agreement or combination between speaker and actor—constitutional principles far more favorable to the speaker come into play. We will discuss those principles in part (3) below.

(2) *Transactions involving the dissemination of technical data for the purpose of promoting or proposing the sale of technical data or items on the munitions list.* In this section, we consider the dissemination of technical data for the purpose of promoting or proposing the sale of technical data or items on the Munitions List.[6] The Supreme Court has given special consideration to promotional materials in a series of recent decisions. Under the rubric of "commercial speech," information that proposes or promotes a commercial transaction has been accorded some constitutional protection. *See Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Counsel, Inc.,* 425 U.S. 748 (1976); *Friedman* v. *Rogers,* 440 U.S. 1 (1979); *Central Hudson Gas* v. *Public Service Comm'n,* 447 U.S. 557 (1980); *Linmark Associates, Inc.* v. *Willingboro,* 431 U.S. 85 (1977). Commercial speech is protected because it "assists consumers and furthers the societal interest in the fullest possible dissemination of information." *See Central Hudson Gas, supra,* at 561–62. At the same time, it has been suggested by the Court that commercial speech is in some circumstances entitled to a "lower level" of protection than that accorded to other forms of protected speech. The courts have said that a "lower level" of protection is justified because "commercial speakers have extensive knowledge of both the market and their products" and are thus "well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity," and because "commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Id.* at 564 n.6 (citation omitted). These factors have led the Supreme Court to conclude that the govern-

---

foreign soil, beyond the legislative jurisdiction of the United States, and our government may have no adequate means of controlling its subsequent use in a way that will protect against a change of circumstance or intention. Accordingly, one could argue that our nation has a substantial interest in suppressing the creation of foreign capacity in the first instance, whatever the present intentions of the foreign enterprise may be; and if a United States technical expert, knowing of the potential danger, combines with the foreign enterprise to create that capacity, that is arguably enough. An analogous principle is operative in the law of espionage. The transmission of sensitive information by a domestic agent to his foreign principal is not constitutionally protected even where the purpose of the transaction is merely to benefit the foreign power, not to injure the United States. As the Supreme Court noted in the leading case, the status of foreign governments may change; no advantage can be given to them without creating a potential for injury to us. *See Gorin* v. *United States,* 312 U.S. 19, 30 (1941).

[6] We are advised by the Federal Bureau of Investigation that technical data are sometimes disseminated in international conferences or meetings for the purpose of promoting the sale of sensitive technology.

ment may ban false or misleading commercial speech, *see Friedman* v. *Rogers, supra,* at 13, 15–16, and, in at least some contexts, commercial speech relating to illegal activity, *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 388 (1973). Similar considerations have led the Court to suggest in dicta that the ordinary First Amendment prohibitions against overbreadth and prior restraint may not be fully applicable to commercial speech. *See Virginia State Bd. of Pharmacy, supra,* at 772 n.24.

For purposes of the present discussion, we need not determine whether the prior restraint doctrine is inapplicable to all commercial speech in all circumstances. In the present context, we believe that a licensing requirement for promotional speech that contains technical data would probably be held constitutional. There are four reasons for this conclusion. First, the governmental interest in preventing the development of military equipment by foreign countries is a significant one. That interest may justify prior restraint against the promotion of foreign technical sales in the same way that the national interest in truth and fair dealing justifies prior restraint against false and deceptive promotions in the ordinary commercial context. *See Donaldson* v. *Read Magazine,* 333 U.S. 178, 189–91 (1948); *FTC* v. *Standard Education Society,* 302 U.S. 112 (1937). Second, a licensing requirement for promotional materials containing technical data will not delay the transmission of information that the public has a strong interest in receiving immediately. In that respect, technical promotions are unlike political speech, for the public will not generally suffer if technical data are suppressed during a licensing period. *Compare New York Times* v. *United States, supra.* Third, the protection accorded to commercial speech is largely designed to protect the rights of listeners and consumers. *See Virginia State Bd., supra.* Those rights are not directly implicated here. Foreign enterprises engaged in the manufacture or use of arms abroad generally have no right under the Constitution to receive information from persons in this country. Finally, the Court has indicated that deference to the political branches is most appropriate in the area of military affairs. *Cf. Rostker* v. *Goldberg,* 453 U.S. 57 (1981); *Brown* v. *Glines,* 444 U.S. 348 (1980).[7] On the basis of these factors, and the intimation in *Virginia State Bd.* that the strong presumption against prior restraints may not be fully operable in the commercial context, we believe that the courts would, in general, uphold a licensing requirement for promotional speech that contains technical data.

Whether the "commercial speech" doctrine has any other bearing upon the constitutionality of the technical data provisions is not entirely

---

[7] Because Congress' determinations are of special importance here, it would be useful to obtain clear and specific legislative authority for the technical data regulations In addition, it may be advisable to provide remedies other than criminal penalties for violation of the ITAR provisions, such as civil sanctions.

clear. The Court has given little guidance concerning the meaning of the operative term. In *Ohralik* v. *Ohio State Bar Ass'n,* 436 U.S. 447, 455–456 (1978), the Court indicated that "commercial speech" is "speech proposing a commercial transaction." *See also Virginia Pharmacy Board, supra.* In *Central Hudson Gas,* by contrast, the Court described "commercial speech" as "expression related solely to the economic interests of the speaker and its audience." 447 U.S. at 561. This characterization prompted a separate opinion from Justice Stevens, joined by Justice Brennan, suggesting that such a definition was far too broad: "Neither a labor leader's exhortation to strike, nor an economist's dissertation on the money supply, should receive any lesser protection because the subject matter concerns only the economic interests of the audience. Nor should the economic motivation of a speaker qualify his constitutional protection; even Shakespeare may have been motivated by the prospect of pecuniary reward." *Id.* at 579–80.

The contours of the "commercial speech" concept are suggested by the facts of the cases that have recognized the commercial speech doctrine. As we have said, speech that promotes a commercial transaction falls within the category. *See id.* (advertisements promoting purchase of utility services and sales of electricity); *Virginia State Bd., supra* (advertisements for pharmaceutical products); *Linmark Associates, supra* (advertisements for real estate); *Friedman* v. *Rogers, supra* (use of trade name by optometrists). Thus far, the characterization as "commercial speech" has been largely confined to speech that merely promotes the sale or purchase of a product or service; in no case has it been applied to nonpromotional material simply because the speaker or writer is motivated by an economic interest, or because he is selling the information for a profit. We do not believe that the Court would hold that the transmission of technical data is "commercial speech" merely because the exporter charges a fee for its disclosure. Such a holding would prove far too much. It would sweep a broad range of fully protected expression into the commercial speech category. Writers of all varieties—political, literary, scientific, philosophical—often charge a fee for the books or articles they produce. There is no authority for the proposition that, simply by virtue of the fact that the documents are transferred for a fee, they are not protected by the First Amendment.

On the other hand, as we have suggested, the dissemination of technical data for the purpose of promoting the sale of a defense article or service would appear to be "commercial speech," and the constitutional barriers to prior restraints may well have a diminished applicability to the dissemination of technical data in that context. As applied to such speech, the ITAR may well be constitutional, given the substantial governmental interest in suppressing the technical data and the qualified nature of the First Amendment protection that is accorded to promotional materials.

211

(3) *Transactions in which an exporter, unconnected with any foreign enterprise, disseminates technical data knowing or having reason to know that the data may be taken abroad and used there in the manufacture or use of arms.* Read in light of the relevant exemptions and definitions, the revised technical data provisions can be applied to any person who proposes to disseminate technical data in circumstances in which he knows or has reason to know that the information will be transmitted or taken abroad and used in the manufacture or use of arms. This coverage is so broad that the revised provisions could be applied in a number of factual settings to persons who are not directly connected or concerned in any way with any foreign conduct carrying dangerous potential for the United States. They could be applied, for example, to communications of unclassified information by a technical lecturer at a university or to the conversation of a United States engineer who meets with foreign friends at home to discuss matters of theoretical interest.

On the basis of the *Edler* decision, we believe that the technical data provisions may be applied constitutionally to persons or firms who combine (with the requisite *scienter*) with foreign enterprises to assist them in the development of sensitive technological capacities. In the absence of special circumstances,[8] however, there is a critical constitutional difference between direct and immediate involvement in potentially dangerous foreign conduct, as in *Edler,* and the speech of the lecturer or the engineer in the examples given above. The difference is a factual one—the difference between conspiracy and assembly, incitement and informing—but it is no less important for constitutional purposes. *See Whitney* v. *California,* 274 U.S. 357, 376–77 (1927) (Brandeis, J., concurring). On the far side of that critical line, speech is not protected when it is brigaded with conduct; on the near side, it is at least arguably protected. Speech does not lose its protected character solely because the circumstances of the case give rise to a reasonable fear that persons other than the speaker may be moved or enabled by the speech to do dangerous things at remote times and places. *See Brandenburg* v. *Ohio,* 395 U.S. 444 (1969).[9] Finally, if speech is arguably protected by the First Amendment, it may not be subjected to prior restraint except in the most extraordinary cases. Prior restraint against arguably protected speech is presumptively unconstitutional. *See Pittsburg Press Co.* v. *Pittsburgh Comm'n on Human Relations, supra.*

---

[8] Special circumstances would include a grave and immediate threat to national security, as where important military information is being communicated to an adversary for current use against the United States. *See New York Times* v. *United States,* 403 U.S. 713 (1971).

[9] In *Brandenburg,* the Court held that speech would not be protected if it was both "directed to inciting or producing imminent lawless action" and "likely to incite or produce such action." 395 U.S. at 447. The "directed to inciting" language at least arguably requires a showing of intent. Accordingly, when intent is absent, speech is—again at least arguably—protected by the First Amendment and may not, therefore, be suppressed by means of a prior restraint. A different conclusion may be appropriate, however, if very grave harm would definitely result from the disclosure. *See New York Times* v. *United States, supra.*

In accordance with these principles, we conclude that, in general, the revised technical data provisions cannot constitutionally be applied to the dissemination of technical data by persons having no direct connection with foreign conduct in settings in which there is no more than belief or a reasonable basis for believing (1) that a foreign national may take the technical data abroad and (2) that the data could be used by someone there in the manufacture or use of items on the Munitions List.[10] In the absence of special circumstances that would justify prior restraint, such speech is arguably protected and, as a general rule, cannot be subjected constitutionally to the revised licensing requirement.

## III. Conclusion and Recommendation

We have concluded that the revised technical data provisions can have constitutional and unconstitutional applications. As a matter of constitutional doctrine, that conclusion would require a court to consider whether the provisions are so substantially overbroad that they are void and unenforceable in all their applications. *See Broadrick* v. *Oklahoma,* 413 U.S. 601 (1973). For the present, however, we will forgo that inquiry in favor of three more pragmatic considerations.

First, *Edler* itself demonstrates that the problems presented by facial overbreadth do not necessarily prevent the enforcement of a licensing requirement in cases in which such a requirement can otherwise be constitutionally enforced. The *Edler* court saw its task as one of saving a necessary system of regulation, and it therefore chose to "construe" the statute and the applicable regulations narrowly to avoid the overbreadth problem and to preserve the possibility of enforcing the system against a criminal defendant (Edler) whose "speech" may not have been constitutionally protected. That approach was consistent with the approach that the Supreme Court itself has taken in some First Amendment cases. *See Civil Service Commission* v. *Letter Carriers,* 413 U.S. 548 (1972). It is an approach that may be taken when new cases arise under the revised technical data provisions.

Second, there is no absolute guarantee that other courts will be as concerned with saving the regulations as the *Edler* court was. The decision whether to enforce the overbreadth doctrine or to save the regulation through narrow "construction" is in part a matter of judicial discretion; and we cannot exclude the possibility that a court would

---

[10] As *Edler* suggests, a different conclusion may be appropriate if the data have only military applications, or if the defendant knows such an application is intended. Even in such contexts, however, there may be situations in which the First Amendment bars a prior restraint consider, for example, a lecture on technical data having exclusively military uses when nationals of American allies are in the audience We do not, however, conclude that the ITAR is unconstitutional with respect to all transactions falling within this category; we merely suggest it has a number of unconstitutional applications.

213

hold the technical data provisions substantially overbroad, and therefore void.

For obvious reasons, the best legal solution for the overbreadth problem is for the Department of State, not the courts, to narrow the regulations. In our judgment, the regulations should be narrowed to make it less likely that they will apply, or be seen to apply, to protected speech falling within the general category described in part 3 of section II above. We would respectfully recommend that an effort be undertaken along that line.[11]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11] We also recommend the legislative changes referred to in note 7, *supra.*